In the United States District Court
for the District of Utah, Central Division

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>vs.<br><br>DANNY FENSTERMAKER,<br><br>          Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Case No. 2:04 CR 666 JTG |

Defendant Danny Fenstermaker was indicted for possession of fifty grams or more of actual methamphetamine with intent to distribute. Defendant filed a Motion to Suppress any and all evidence discovered during the warrantless search of his home on May 25, 2004. An evidentiary hearing was held, after which the parties filed memoranda, the Court heard oral arguments, and the parties submitted the matter for decision. The motion was taken under advisement.

The Court has reviewed the entire record, and after due consideration defendant's motion is GRANTED consistent with this Memorandum Decision and Order.

STATEMENT OF FACTS

In May 2004, Detective Tracy Wyant ("Wyant") received several complaints from concerned citizens about suspicious activity that was occurring at the residence on 1868 West 4960 South, Taylorsville, Utah. Wyant investigated the complaints by running license plate numbers that the concerned citizens had given him, as well as license plates that he had observed.

He found that a significant portion of the persons with the registered license plates had a history of narcotics.  Also, as part of his investigation, Wyant determined that Danny Fenstermaker ("defendant") and Trisha Kelly ("Kelly") had been living at the residence for approximately two weeks, and that the complaints received corresponded to this two week time frame.

On May 25, 2004, rather than obtaining a search warrant from an appropriate magistrate, Detective Wyant, dressed in plain clothes, went to the residence to investigate the concerned citizens' complaints in a "knock and talk" procedure without a search warrant.  In accordance with their predetermined "plan" to gain entrance into the home, Wyant was to be accompanied by Officer Douglas Barney ("Barney") who was in uniform, but Barney was not to be visibly present at first because of his uniform.  Wyant and Barney had arranged that Wyant in plain clothes would knock on the door in order to gain entrance, and Barney in his uniform would stand back and to the side of Wyant until someone answered the door.

Detective Wyant knocked on the door, and Kelly answered, opening the door.  Shortly after the knock and in the course of discussion at the door before entry, Barney who had just pulled up in his car – joined Wyant at the door.  Wyant testified that he identified himself verbally, showed her his badge, and said he had received "multiple complaints about suspicious activity . . . and wished to speak to her." (Tr. at 10, 35, 36).  Barney testified that he also heard Wyant ask "if we could come in and talk to her." (Tr. at 56, 71).  Kelly partly opened the door, but testified that she was "pretty sure" she did not invite them to enter. (Tr. at 92).  However, the officers believed that Kelly was inviting them in when she stepped back and further opened the door.  Wyant and Barney interpreted that to be non-verbal consent to enter, which they did.  (Tr.

at 83). Kelly said that she was distracted by her dog at the door, but the officers were unaware of a dog at the door. Kelly made no suggestion to talk outside the house, and made no objection to their entrance. Also, once inside she voiced no objection at any time to the officers about them being in the home. (Tr. at 52). Kelly testified that when Wyant entered the house "I didn't feel scared" or believe that this was a trespass. (Tr. at 95). She also said that she knew that both Wyant and Barney were police officers, that she "didn't ever tell them to leave," and that she understood they were there "to talk about issues relating to drug trafficking." (Tr. at 95, 96). Kelly testified that after the officers were in the house they said they had received complaints concerning suspicion of narcotics. (Tr. at 87-88).

At this point, the defendant appeared from a hallway dressed only in a towel, and asked who was at the door. Detective Wyant said, "Taylorsville Sheriff's Department," and said that they needed to speak with Mr. Fenstermaker and Ms. Kelly about complaints concerning possible drug activity in the premises or words to that effect. Defendant said he was willing to speak with them, but he requested to put some clothes on. Wyant agreed, but said for officer safety purposes he would accompany the defendant to his bedroom, to which defendant acquiesced. Defendant later explained that he had not objected because he felt that Wyant was "going to do whatever he wants to anyway." (Tr. at 118). Wyant accompanied defendant to his bedroom in order to allow defendant to get dressed. While in that room, not in response to any questions, defendant said that there were narcotics in the house and that he was on federal probation. Defendant then asked Wyant if he had a search warrant. (Tr. at 12, 43-44). Wyant stated that he did not have a search warrant, but that the officers were requesting consent to

search the house without a warrant. Wyant said that defendant then said that perhaps Kelly had a small amount of weed in the house and requested that he be allowed to speak to Kelly privately for a few minutes "about the situation." (Tr. at 12, 119).

Wyant agreed that defendant and Kelly should have a few minutes to talk in the livingroom while the officers waited in the adjacent hallway. After that private conversation, before defendant said anything, Wyant said that he "again explained to both parties that Mr. Fenstermaker indicated that narcotics were . . . present in the home," and that consent to search was requested. There was no response by defendant denying what Detective Wyant had said about defendant's admission that narcotics were in the house, but the defendant "requested I [Wyant] get a search warrant." (Tr. at 46). Barney testified that Wyant then said in response to defendant's request for a warrant, "Is that what you want to do?" (Tr. at 79). Barney testified that defendant and Kelly then talked privately again for a second time. Barney also stated that he was "holding security" and "essentially in charge" of Kelly. (Tr. at 72, 77). During the time that defendant and Kelly were conversing, Barney said that he and Wyant talked in whispers to each other, and that Wyant said that he thought he could smell marijuana, and also said "something about the bedroom . . . about what happened in the bedroom." (Tr. at 80). At some point after defendant and Kelly presented themselves, Wyant recalled that defendant asked him if he was sure he could obtain a warrant, to which Wyant replied that he was confident he could obtain one. (Tr. at 15, 79). When asked why, Wyant testified that he was "very confident" that he could acquire a search warrant for the residence "based on the statements that he [defendant] had made just previously indicating narcotics were present in the home, based on the history, and

based on the [prior] independent investigation . . ..." (Tr. at 15,16). Defendant then said, "If I don't let you search you're just going to get a search warrant aren't you?" According to Officer Barney, Wyant replied that "I would apply for a search warrant . . . with what I've got." (Tr. at 79).

Defendant said that Wyant stated that he would now leave to get a warrant, and started to leave the home, but said that Officer Barney would be staying there in the house with the defendant and Kelly, while they sat on their couch until he (Wyant) returned with the search warrant and that after he obtained the warrant <u>both</u> the defendant and Kelly would be charged with possession of drugs if any were found in the house. (Tr. at 90, 121)

A short time after Wyant made the aforesaid statements, the defendant and Kelly retracted or "recanted" their request for a search warrant, and agreed to a consensual search. Before the search was commenced, however, defendant stated that Kelly "had nothing to do with it" and that he would "show them where the shit is [reference to the narcotics]." (Tr. at 61). Kelly said "Don't show them," but defendant stated that "They're going to get the stuff anyway . . . they know what is going on. I'm going to prison anyway." (Tr. at 61, 62).

Defendant testified that he and Detective Wyant had a private conversation before the defendant showed Wyant where the drugs were located, as follows:

<u>Testimony by Defendant</u>

      A.    I didn't want my girlfriend to be charged and my only action at that point was to do that . . . [t]ell the officer what was in the home.

      Q.    Okay. Even though he didn't have a search warrant?

      A.    Correct . . . I told the officer that I will tell them what's in the house if you will

>    release my girlfriend from detainment and not charge me with the – because there was a school, a church, and a park up the street from my house, I ask that it not be added in my charges and to try to make it not go federal as much as he could.
>
> Q.    What did he say?
>
> A.    He told me he would try with the rest of it, but he would let Ms. Kelly go at the time.
>
> Q.    Now, is that why you let him search?
>
> A.    Yeah.

(Tr. at 123-124).

Later, when defendant was "being loaded into the [police] vehicle," Wyant testified at the evidentiary hearing that "perhaps" defendant reiterated his desire to leave Kelly out of it, and that Wyant "would not pursue federal charges on him [defendant]," although Wyant stressed that he could not control what the probation officer would do or what the U.S. Attorney's office would do. (Tr. at 50, 51).

The Court finds that Wyant either agreed as set forth above, or lead defendant to believe that if consent were given to search without a warrant, he would let Kelly go without being charged and that he would "try with the rest of it." (Tr. at 124).

Although the officers did not actually threaten defendant or Kelly, defendant testified that he recanted his request to get a search warrant because "I was being threatened by the officer [with a search warrant], and I didn't want my girlfriend to be charged, and my only action at that point was to do that [show them where the drugs were]." (Tr. at 123).

This Court finds that after defendant had said that he and Kelly would not permit a search without a search warrant, Detective Wyant in substance and effect said that if drugs are

found in the course of search <u>with</u> a warrant defendant's girlfriend, Kelly, would be charged along with defendant with drug possession.  In the context of what happened after Wyant stated that Kelly as well as defendant would be charged if drugs were found, the Court finds that Wyant's statement constituted coercion or intimidation.  Wyant was well aware that defendant's main concern was not to have Kelly charged with possession of drugs because the drugs were all his, and Wyant had agreed or had lead defendant to believe that Kelly would not be charged.  This Court finds defendant's testimony to be credible that he was willing to recant his refusal and consent to a search without warrant because he believed this was the only way Kelly would not be charged.  Further, defendant believed that in the absence of consent to search defendant and Kelly in effect were to be placed under house arrest in the custody of Officer Barney while Detective Wyant went to obtain a search warrant.

       Sometime after defendant agreed to allow the "consensual search", and to show the officers where the drugs were, Wyant told defendant that he would have to sign a consent to search form.  Wyant testified that he told defendant that he could refuse the search, and that signing the form would have to be voluntary.  (Tr. at 19, 63).  Thereafter, defendant signed a consent to search form and took Wyant to the basement and showed him where the drugs were located.  After the drugs were located, Wyant placed defendant under arrest.  Kelly was not placed under arrest and was not charged, apparently in furtherance of the previous arrangement between defendant and Wyant.

ARGUMENTS

Defendant argues that the officers' warrantless search of the home was unlawful because the officers did not have a search warrant and entry into the home was accomplished without valid consent of defendant or Kelly.  Accordingly, defendant submits that all of the evidence and statements made by defendant during the warrantless search should be suppressed.

Defendant also argues that his statements allegedly made in the bedroom of the home to Detective Wyant should be suppressed because no Miranda warning was given; defendant also claims he was unlawfully detained while dressing in the bedroom – without the requisite probable cause or exigent circumstances; finally, defendant argues that his consent to search after recanting refusal to search was coerced and not voluntary, and that his execution of the consent to search form was not voluntary.

The government argues that the evidence and statements should not be suppressed because officers conducted a legal "knock and talk" investigation at the premises.  The government states that officers gained valid entry into the home when Kelly answered the door and allowed them to enter.  The government maintains that defendant intelligently and voluntarily gave his consent to search to Detective Wyant and that there was no coercion by officers to obtain the consent to search.

ANALYSIS

The heart of this case has to do with the circumstances concerning defendant and Kelly "recanting" their prior request for Detective Wyant to get a search warrant.  The circumstances under which that about-face took place lead this Court to the conclusion that the

8

retraction or "recanting" of defendant's request for a search warrant was not truly consensual or voluntary. Rather, it was obtained by implied coercion that assurances made or implied would not be fulfilled if consent to search was not given. In this regard, this Court finds that the government failed to carry its burden of proof that the recanting of the request to get a search warrant was freely and intelligently given. Defendant believed that he had been assured that his girlfriend, Kelly, would not be charged. Defendant was then confronted by the clear statement that Kelly would be charged if drugs were found during the course of search pursuant to a search warrant. In addition, defendant was made to believe that he and Kelly in effect would be under house arrest in the custody of Officer Barney while Detective Wyant was to attempt to obtain a search warrant. Defendant no doubt believed that if he recanted and gave "consent" the assurances he relied upon would still be honored.

In reaching its conclusions, this Court relies upon the following principles of law as set forth by the Tenth Circuit, the Supreme Court and other authority, as applied to the facts of this case:

WARRANTLESS ENTRY INTO HOME

The Tenth Circuit has stated that, "[t]he warrantless entry of the home is 'the chief evil against which . . . the Fourth Amendment is directed.'" *United States v. Lowe*, 999 F.2d 448, 451 (10th Cir. 1993)(citing *Untied States v. Untied States District Court*, 407 U.S. 297, 313 (1972)). "A warrantless search or seizure is *per se* unreasonable unless shown to fall within one of the carefully defined set of exceptions." *Lowe*, 999 F.2d at 451 (see *Coolidge v. New Hampshire,* 403 U.S. 443, 474 (1971)). However, it is generally recognized that "a 'knock and

talk' is ordinarily consensual unless coercive circumstances exist." *United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005)(*citing United States v. Jerez,* 108 F.3d 684, 691-92 (7th Cir. 1997)).

The Court determines that entry into the home by police officers in this case was not coercive and that it was valid pursuant to a legal "knock and talk" investigation of the premises occupied by defendant and Kelly. The officers entered the home without any objection, with voluntary consent, and without coercion. There was no brandishing of guns and no express or implied coercion or duress was used in order to obtain consent to enter.

Based upon a review of the totality of the circumstances, this Court determines that consent to enter the home was freely, voluntarily, and intelligently given. The Court makes no finding as to whether the officers' "plan" to gain entrance constituted trickery.

### VOLUNTARY CONSENT TO A WARRANTLESS SEARCH

Whether consent to a warrantless search was given "voluntarily" is to be "determined from all the circumstances." *United States v. Abdenbi*, 361 F.3d 1282, 1287 (10th Cir. 2004)(citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 249 (1973)).

In *Abdenbi,* the court stated,

> The question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.

*Abdenbi*, 361 F.3d at 1287 (citing *Schneckloth*, 412 U.S. at 227).

"The burden of proving voluntariness is borne by the government." *Id*. (citing *Schneckloth*, 412 U.S. at 248), *See also United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir.

1998)(citing *United States v. Cody*, 7 F.3d 1523, 1526 (10th Cir. 1993)). In *Lowe,* the Tenth Circuit stated: "By clear and positive testimony, the court must find that the consent was 'unequivocal and specific' and 'freely and intelligently' given, and the government must prove that consent was given without duress or coercion." 999 F.2d at 451 (citing *States v. Price*, 925 F.2d 1268, 1270 (10th Cir. 1991)).

In *Pena*, the Tenth Circuit outlined the following two-part test concerning the government's burden of proof: "First, it must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given. . .. Second, the government must show that the police did not coerce the defendant into granting his consent." *Pena*, 143 F.3d at 1366 (citing *United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir. 1995)).

PROBABLE CAUSE TO CONDUCT WARRANTLESS SEARCH

– <u>Justified by Exigent Circumstances – Incriminating Statements</u>

In the case at bar, after police officers gained consensual entry into the home, wholly voluntary statements of admission were made to Detective Wyant, when the defendant, without questioning, told Wyant that narcotics were in the house and that he was on federal probation. Those statements were voluntary and did not require the prior giving of the Miranda warning. The officer may have been considering whether at that point probable cause existed to conduct a warrantless search based upon exigent circumstances. But were the statements by defendant in and of themselves sufficient justification to conduct such a search? No doubt Officer Wyant was well aware that the officers could not proceed with such a warrantless search of the house unless there was clear and persuasive evidence of probable cause bolstered by

"exigent circumstances" or "consent to search."

Notwithstanding presumed knowledge of legal requirements to conduct a warrantless search as set forth above, Detective Wyant may well have considered that since he had no evidence of actual sales of narcotics or other specific evidence – except the statements of admission by defendant that narcotics were in the home – that "exigent circumstances" were not present. If defendant were to deny making those statements, Wyant's basis for proceeding under exigent circumstances would have been doubtful as compared with proceeding under consent to search.

– Probable Cause for Warrantless Search Justified by Consent to Search

"Probable cause is measured against an objective standard. The facts and circumstances must warrant a prudent man in believing that an offense has been or will be committed." *United States v. Smith*, 797 F.2d 836, 840 (10th Cir. 1986)(citing *United States v. Lopez*, 777 F.2d 543, 551 (10th Cir. 1985)). The *Smith* court goes on to state "Even if probable cause exists to conduct a warrantless search, such as here, still such a search is unlawful as violative of the Fourth Amendment *unless justified by consent to search*, search incident to arrest, or exigent circumstances." *Smith*, 797 F.2d at 840 (emphasis added).

"An exception to the warrant requirement that allows police fearing the destruction of evidence to enter the home of an unknown suspect should be (1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of the evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency

that are not subject to police manipulation or abuse." *United States v. Aquino*, 836 F.2d 1268, 1272 (10th Cir. 1988).

Drug trafficking and sale of illegal drugs have been held to be serious offenses where the evidence is likely to be destroyed, and "'when officers have reason to believe that criminal evidence may be destroyed or removed before a warrant can be obtained, the circumstances are considered sufficiently critical to permit' a warrantless entry." *United States v. Scroger*, 98 F.3d 1256, 1260 (10th Cir. 1996)(citing *United States v. Parra*, 2 F.3d 1058, 1064 (10th Cir. 1993)(internal citations omitted)).

Detective Wyant, for whatever reason, may have felt that notwithstanding possible reliance upon "exigent circumstances," consent to search would be the best avenue to follow. In any event, that is the avenue the police officers elected to pursue.

It must have seemed likely to the officers that defendant and Kelly would agree to give consent to search in view of the admissions defendant had made to him. However, after his private conversation with Kelly, defendant told Detective Wyant in no uncertain terms that "you're going to have to get a search warrant," to which Wyant answered that he was "confident" he could get one "with what I've got". (Tr. at 79). Just before defendant made that statement, and before defendant recanted, Officer Barney remembered that Wyant had talked to him in the hallway about some of the factors which "led him to believe that he could get a search warrant, and [that] what happened in the bedroom or something like that left me with the impression that, you know, this was – something was happening here, you know what I mean, that this wasn't one where we were going to go, 'Oh, the neighbors are just being nosey or something. Let's just get

out of here' type thing." (Tr. at 80). This statement underscores the intention of the officers to stay and conduct the search because Detective Wyant was confident that drugs were in the house. The avenue chosen was to proceed after obtaining voluntary consent to search.

– <u>Consent to Search Given After Refusal to Consent to Search Without a Warrant</u>

Under the first prong of the *Pena* two-prong test, on the face of things defendant unequivocally and intelligently consented to the search of his home by recanting his request for the officers to get a warrant to search. However, the government failed to meet the burden of proof to show that this consent was "freely" and voluntarily given.

Detective Wyant well knew that defendant's principal concern was that his girlfriend, Kelly, not be charged. In that regard, defendant testified that he recanted his request that the officers get a search warrant in order to prevent Kelly from being charged. Defendant had admitted that the drugs were his and that Kelly "had nothing to do with it." Further, he believed he had been assured that Kelly would not be charged under the consent to search arrangement. Wyant calculated that under these circumstances defendant would abandon his refusal to consent to search if he believed that Kelly's protection would be lost if Wyant were required to obtain a search warrant as he said he would do. This Court finds under the totality of circumstances that Wyant's response to defendant's refusal to permit a consent to search without a warrant was coercive and defendant's decision to "recant" and consent to search without a warrant was not "freely" or voluntarily given. In any event, the government did not shoulder its burden to establish that consent was freely and voluntarily given.

Under the second prong of the *Pena* two-prong test, the Court considers the

following factors:

> [P]hysical mistreatment, use of violence, <u>threats</u>, threats of violence, <u>promises or inducements</u>, <u>deception or trickery</u>, and the physical and mental condition and capacity of the defendant within the totality of the circumstances. An officer's request for consent to search does not taint an otherwise consensual encounter 'as long as the police do not convey a message that compliance with their request is required.'

*Pena*, 143 F.3d at 1367 (citing *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994)(citations omitted))(emphasis added).

In applying these factors to the case at bar, the government has failed to show that the consent to search was valid. In this regard, the government failed to show that consent was voluntarily, freely and intelligently given in spite of alleged assurances, or that such assurances were not made. Arguendo, even in the absence of actual or implied promises, the "threat" to charge Kelly may well have rendered the giving of consent by defendant as not freely and unequivocally given. However that my be, the government failed to demonstrate otherwise by a preponderance of the evidence.

The government failed to negate the inference of coercion by having withdrawn assurances, express or implied, which this Court has found created a coercive atmosphere. In defendant's mind the officers presented defendant with no other choice than to consent to search in order to protect his girlfriend, Kelly. In this regard, the government failed to show that the officers did not coerce the defendant. Thus, the government failed to meet its burden under this second-prong of the analysis.

Moreover, troublesome irregularities in the execution of the consent to search form existed. The government failed clearly to show that the consent to search form was

executed before rather than after the search. In addition, defendant was to have initialed each paragraph as required by instructive language set forth in an asterisk in the form. That was not done.

        Based upon the totality of the circumstances, this Court determines that consent to conduct the warrantless search was not freely and voluntarily given by defendant or Kelly. Rather, under the totality of the circumstances, this Court finds that the government failed to carry its burden to show that such consent was freely, voluntarily, and intelligently given to search the home without a warrant, and that defendant was not coerced into providing such consent. It follows that the warrantless search based upon such "consent" constituted a violation of the Fourth Amendment of the U.S. Constitution.

        Accordingly, it is hereby

        ORDERED, that Defendant's Motion to Suppress is GRANTED consistent with this Memorandum Decision and Order.

        DATED this <u>18th</u> day of <u>November</u>, 2005.

        _____
        J. THOMAS GREENE
        UNITED STATES DISTRICT JUDGE